We'll hear argument now in the case of Frazee against Berryhill. Mr. Rodman. May it please the court. My name is Jason Rodman. I represent the Ms. Frazee had brawny swelling, which is a specific kind of swelling. It's a swelling with hard, thickened, dark hue. And that met the cardiac listings back in 2009. And in late 2012, the commissioner, and I'm going to call them the commissioner for the purposes of simpleness, but there's not currently a commissioner or an acting commissioner. I had the, in 2012, the commissioner decided that, oh, we're going to check in because we think this narrow condition is going to have gotten better. So they did that and they concluded that thereby, because she no longer met that specific listing regarding that brawny edema, that she was no longer disabled. And so it is Frazee's position that the ALJ, the disability has ceased. And this shows up, you know, in terms of, you know, what is medical improvement exactly and what's related to ability to work. But in, and it alternately at, you know, when you consider all the impairments in combination, severe or non-severe, do they form the residual functional capacity that is accurate and matches up to her alleged ability to work? And it is Frazee's position that she did, that the ALJ did not properly meet the burden at these steps and in general didn't meet the burden to show that disability was ceased. Rather, when you read the administrative law judge opinion, you see over and over again, back to the listing, oh, there's not brawny edema, it's not open swelling, but it was a different kind of swelling that she was dealing with. And it was other impairments that had gone downhill since then. So it's called a comparison point decision, a CPD. And it's called that for a reason, because you're expected to compare it. Go back and forth, back and forth, back and forth, compare. And if you don't do that, that is grounds for remand as a matter of law. In this case, I mean, just compare that December 2012 consultative examiner with the prior condition. The back range of motion is significantly decreased. The neck range of motion, and this is since the prior time, the neck range of motion significantly decreased. There was this new hip related range of motion that significantly decreased at measure by measure by measure. The BMI, this is a 5 foot 4, roughly 300 pound woman, but it's gone really high as well. And then there are, by the way, I'm glancing at the clock, I'd like to reserve three minutes for a rebuttal, but, and then there are functional limitations in that CE in December 2012, including for sitting. Those were never made before. There was never, in fact, it said prior, she could sit for an unlimited period of time, but now she's got restrictions on sitting. In late March, after they told her she wasn't disabled, she's a trooper, she's a hoosier, she went back to work. She tried. And she had swelling before she went back to work in her legs, but she went back to work anyway. And then she checked in and in May 2013, she went to her doctor and during that time period, in some medical records that I can't decipher them, your honors, maybe you guys have better eyes than I do, but the ALJ says that what it said in those records was that she could only had to elevate her legs 20 minutes every four hours. I couldn't decipher that from there, which to me is a problem of substantial evidence. But let's suppose the ALJ were right about that. Then that would have needed to be introduced in the context of she was trying to work then. She was still trying to work. So to do it more than that would have interfered with her workplace situation. That would have been something she could have taken to her employer and said, hey, this is what I'm supposed to do. Of course, that job didn't last. The legs were swollen. They were continually a problem. She lost her job. She lost her health and she needed a wheeled walker. But the ALJ makes a big deal out of the fact that she didn't formally have a prescription for that wheeled walker. Well, when her things went downhill such that she needed the wheeled walker, she didn't have insurance. So she was doing that for more than a year before the hearing, relying on this wheeled walker walking around, and things had gone downhill. The second argument is that entire lines of evidence were ignored in sort of doing a shortcut. So a listing is sort of a shortcut. You meet a listing. You're disabled. That's a shortcut. But when you're saying, oh, you're not disabled, it doesn't make sense to simply do that shortcut. But that's almost all the ALJ does. And so some entire lines of evidence that are ignored include the fact that for various purposes, she was doing a cardiac test, a 35-minute mile. She didn't do a mile, but that's the speed, 35-minute mile. That's a really slow walk. She could not do that one time for more than three minutes. They had to stop it. And yet, according to the commissioner, she could do that, you know, six of eight hours a day. And then, you know, another line of evidence that wasn't acknowledged is that she tried to work. She went back, and it did not work out. Instead, the ALJ tries to use that against her. Another line of evidence, Dr. Gemlich, you know, implicitly opines that her morbid obesity combined with her knee problems and that the two were interrelated. The ALJ does not deal with those things. So for these reasons, Frazee asks the court to remand for further consideration because the commissioner has not met their burden. And I'm going to save the rest of my time for rebuttal unless your honors have any questions for me at this time. Certainly, counsel. Mr. Truitt. I'm Eric Truitt on behalf of the commissioner. The ALJ met the burden to show that Frazee's 2009 comparison point decision, the only basis for that decision was that her impairments met listing 4.11, which, as Mr. Redman indicated, is for brony edema. There's no question in this case, as of February 2013, when she was found to be no longer disabled, that the brony edema was no longer there, or at least did not meet the listing's requirements. So when you're dealing with a disability secession case, the first couple steps of the eight-step sequential evaluation process are basically looking at, was the basis for the old decision still in effect at the time of the review? And clearly, no. There's no argument and there's no evidence that her impairments still met listing 4.11. So that's why the ALJ focused on that issue at the beginning, because that's the requirement of the sequential evaluation process used in these disability cessation cases. Then the ALJ went on to consider the subsequent steps, which sort of resemble what you would see in an ordinary disability case, and what's at issue here are steps 7 and 8, which correspond normally to steps 4 and 5. Was Frizee able to do her past relevant work, or was she able to successfully adjust to other work in the national economy? And substantial evidence supports the ALJ's decision at both step 7 and step 8, and therefore the district court's judgment should be affirmed. Now dealing with Frizee's ability to do her past relevant work, the evidence that, and the argument that Frizee raised in the district court, was that the ALJ had erred in evaluating the opinion of the consultative examiner. But the problem with this argument, as the commissioner and the district court pointed out, is that Dr. Ringel, who performed the consultative examination, didn't actually provide a statement about Frizee's RFC, or her ability to sit, stand, walk, push, pull, etc. Instead Dr. Ringel provided medical evidence, range of motion, strength testing, things like that, and that medical evidence was then analyzed by the agency's medical consultants. Well both of the agency's medical consultants looked at Dr. Ringel's report and said it was consistent with an RFC for light work. So the only doctors that provided an opinion about Frizee's ability to work both agreed with the ALJ that she could do light work. Dr. Ringel provided medical evidence, but all of the extrapolations about what Dr. Ringel's report means are coming from plaintiff and her attorney, they're not coming from Dr. Ringel, and the actual medical experts who looked at Dr. Ringel's report said it was consistent with the ALJ's findings. Now even if you don't think that's the case, and you think that Frizee is unable to do her past relevant work, the ALJ made an alternative finding at Step 8, which we would normally think of as Step 5 of the sequential evaluation process, the ability to do other work. The vocational expert testified that even if Frizee needed to use a walker, needed to sit for 6 hours per day, and could only lift 10 pounds, she could still do a variety of sedentary jobs in the national economy. So the only argument that the claimant, that Frizee raised in the district court, is flawed and it also does not account for the ALJ's alternative finding at Step 5. Now on appeal, perhaps recognizing some of the shortcomings of the arguments that she raised in the district court, she tries to identify new evidence or new arguments about errors in the ALJ's decision, but as this court has often found, raising it for the first time on appeal is too late. These types of arguments need to be made in the district court, not in the appellate court. But even if you look at the evidence and the arguments that they're identifying for the first time on appeal, there's very significant problems with those arguments. So Mr. Rodman, for example, referenced a treadmill test. Well there's a couple problems with this argument. The first is that the treadmill test evidence was not before the administrative law judge. This evidence was submitted to the appeals council. And so you can't take the administrative law judge to task for failing to consider evidence that wasn't in the record at the time of the decision. This evidence, although it's dated before the ALJ's decision, it was submitted to the appeals council and you can see that on transcript 5 of the record. It references that Exhibit 19F was submitted to the appeals council. Exhibit 19F is the treadmill test that Mr. Rodman was referring to. But even then, if you look at the actual treadmill test, there's an erroneous assumption that the claimed inability to complete a treadmill test on an incline is the same thing as the claim that a treadmill is going to be more challenging than ordinary conditions. And moreover, the treadmill test is not designed to test your ability to walk or test your functional capacity at work. What they're really trying to do is get your heart moving so they can get a better image of the heart. And what happened, if you look at the actual description of the test, once she said she wasn't unable to do the treadmill test, they used a chemical substitute that basically it's a medication that ups the heart rate. It simulates the effect of a treadmill. And then they were able to get images of the heart and the actual report says that her heart was in fine condition and they didn't find any abnormalities. So there was a report that she was unable to complete the treadmill test, but that doesn't mean that she's unable to walk. And ultimately, once they did the alternative version of the test, it showed that there were no heart impairments. So to sum it up, there's substantial evidence that her disability ended. It's unquestioned that the original basis for the determination was no longer there. She no longer met Listing 4.11 and therefore it was reasonable to determine that her disability had ended. Now she's pointing to additional impairments that either allegedly worsened or developed even after the date that she was found to be no longer disabled. But the problem with those arguments is that the only two doctors who reviewed the examination report and provided an opinion both said that Frizzee would be able to do light work as the ALJ found. So for those reasons, the Commissioner respectfully requests that the District Court's judgment be affirmed and that the Commissioner's final decision be affirmed. Thank you, Mr. Truitt. Anything further, Mr. Rodman? Yes, Your Honor. Thank you. I would like to say preliminarily that just what seems to have happened here effectively is that no listing when you read that ALJ decision was used as a sort of shortcut of sorts to no disability. That is improper. If you wanted to, I could brief you and multiple circuits have addressed something along that lines. And briefing you on something like that wouldn't be a new argument. It just fleshes out something further. So likewise, in the District Court, the Frizzee team argued that the throughline of the RFC was not accounted for in light of the record and the evidence. That is the core of our argument on appeal. Also, the Commissioner argues that Dr. Ringel, the doctor who the SSA hired specifically to make a comprehensive examination and assessment of Frizzee, the functionality. Well, if you look at that report, there was a section specifically titled Functional Limitations. And it is true that the SSA examining doctor introduces that functional limitation section with the language, the claimant asserts or something or some such. But the SSA is a powerful organization and doctors generally do what they want to. If that language could make the functional opinion disappear, the SSA should forbid it. Allowing that to continue just gives an easy out for an ALJ to have kind of a now you see it, now you don't doctor opinion. I don't think that that is logical. It's a logical bridge problem. As is the leaning on the non-examining consultants exclusively to have them supersede the actual examiner who the SSA hired. And then, just as an add-on, the logical bridge problem is one of the core arguments in the commissioner's briefing and implicit in the argument today is oh, well, there's not atrophy. How many times do you see that in the administrative law judge decision? Oh, there's not atrophy. But in fact, as the commissioner acknowledges implicitly, you only get atrophy if you don't walk for more than like three to five minutes a day at all total. Frizzee never alleges that. So in sum, the ALJ opinion doesn't really make sense and we ask you to agree. Thank you. Thank you very much. The case is taken under advisement.